**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA
HUNTINGTON DIVISION**

CARLOS JARRETT SPENCE,

      Plaintiff,

v.                                CIVIL ACTION NO. 3:13-cv-20720

ANDREW SAUL,[1]
Commissioner of Social Security,

      Defendant.


## MEMORANDUM OPINION AND ORDER

      Plaintiff Carlos Jarrett Spence ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying his applications for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33, and for Supplemental Security Income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381–83f.  Presently pending before this Court are Claimant's Supplemental Brief in Support of Judgment on the Pleadings (ECF No. 20) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 23).

      For the reasons explained more fully herein, Claimant's request to reverse the Commissioner's decision (ECF No. 20) is **DENIED**, the Commissioner's request to affirm his decision (ECF No. 23) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED**.

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Federal Rule of Civil Procedure 25(d).  *See also* 42 U.S.C. § 405(g) (stating that action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

## I.    BACKGROUND

### A. *Information about Claimant and Procedural History of Claim*

Claimant was 45 years old at the time of his alleged disability onset date and 53 years old on the date of the most recent decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 684.)[2]  He received his GED.  (*Id*. at 701.)  Most recently, he worked as a security guard at a coal mine, and he has also been employed as a die-setter at a stamping plant.  (*Id*. at 28, 220.)  Claimant alleges that he became disabled on April 10, 2010, due to a back injury, a broken right foot and ankle, a pinched nerve in his right shoulder, left elbow and left leg pain, gout, and depression.  (*Id*. at 219.)

Claimant filed his applications for benefits on May 19, 2010.  (*Id*. at 159–62.)[3]  His claims were initially denied on August 23, 2010, and again upon reconsideration on June 2, 2011.  (*Id*. at 90–99, 104–09.)  Thereafter, on June 6, 2011, Claimant filed a written request for hearing.  (*Id*. at 110–11.)  An administrative hearing was held before an ALJ on February 22, 2012, in Huntington, West Virginia.  (*Id*. at 22–71.)  On March 23, 2012, the ALJ entered an unfavorable decision.  (*Id*. at 7–21.)  Claimant then sought review of the ALJ's decision by the Appeals Council on May 24, 2012.  (*Id*. at 6.)  The Appeals Council denied Claimant's request for review on May 18, 2013, and the ALJ's decision became the final decision of the Commissioner on that date.  (*Id*. at 1–5.)

Claimant timely brought the present action on July 19, 2013, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g).  (ECF No. 1.)  The Commissioner filed an Answer (ECF No. 8) and a transcript of the administrative

---

[2] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 9 and the Supplemental Transcript of Proceedings filed in this action at ECF No. 16.

[3] During the pendency of these proceedings, Claimant filed another application for SSI benefits on February 13, 2014. (Tr. at 1002–06.)  Consideration of that application was consolidated with these proceedings on August 12, 2015.  (*Id*. at 762.)

proceedings (ECF No. 9). On September 30, 2014, this Court entered a Memorandum Opinion and Judgment Order remanding this matter to the Commissioner for further proceedings. (ECF Nos. 13, 14.)

Upon remand, another hearing was held before an ALJ in Huntington, West Virginia, on November 10, 2015. (Tr. at 878–910.) That ALJ issued an unfavorable decision on December 11, 2015, and Claimant sought review of the decision by the Appeals Council on February 12, 2016. (*Id.* at 781–806, 911–17.) The Appeals Council remanded the case to a third ALJ on November 29, 2016. (*Id.* at 807–13.) A third hearing was held before that ALJ in Huntington, West Virginia, on September 6, 2017. (*Id.* at 695–743.) The third ALJ issued an unfavorable decision on January 8, 2018. (*Id.* at 668–94.) Claimant again sought review by the Appeals Council on February 12, 2018. (*Id.* at 974–79.) The Appeals Council denied Claimant's request for review on April 24, 2019. (*Id.* at 663–67.)

Thereafter, on June 28, 2019, the Commissioner moved to reopen the case previously before this Court. (ECF No. 15.) On July 12, 2019, the Commissioner filed a supplemental transcript of the administrative proceedings. (ECF No. 16.) This case was reopened and reinstated to this Court's active docket on August 16, 2019. (ECF No. 17.) Claimant subsequently filed his Supplemental Brief in Support of Judgment on the Pleadings (ECF No. 20), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 23). As such, this matter is fully briefed and ready for resolution.

### B. *Relevant Medical Evidence*

This Court has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here.

*1. Treatment for Back Pain*

A March 16, 2010 MRI of Claimant's lumbar spine revealed "degenerative disc change at L4-5 and L5-S1" with "mild bulging of the disc at L4-5 without canal stenosis," an annular tear at the L4-5 vertebrae, and "mild foraminal stenosis bilaterally at L5-S1 due to facet arthropathy change." (Tr. at 661–62.) Another MRI of Claimant's lumbar spine that was conducted on April 5, 2012, reflected "[s]ignificant disc desiccation at L5-S1 causing moderate to marked biforaminal impingement, right greater than left" and "[m]oderate biforaminal impingement at L4-5 secondary to disc bulge" but "[n]o acute bone marrow edema, fracture or subluxation" or "evidence for significant central canal stenosis." (*Id.* at 660, 1117.) On June 27, 2012, Claimant also underwent a CT scan of his lumbar spine, which showed "[s]evere degenerative disc disease" and a "[b]ilateral pars defect" at the L5 vertebra. (*Id.* at 1118.)

On January 7, 2015, Claimant presented to his primary care physician, Dr. Korey Mitchell, M.D. ("Dr. Mitchell") and requested a referral to a pain management clinic "for back pain." (*Id.* at 1142.) Claimant again requested a referral on May 20, 2015, reporting to Dr. Mitchell that he experienced "pain through [his] lower back with intermittent numbness of [his] bilateral [lower extremities]." (*Id.* at 1148.) Upon examination, Claimant had "[p]ain associated with lumbar flexion and extension," but he had a full range of motion in his lumbosacral spine, and a straight-leg-raising test was normal. (*Id.* at 1150.) Dr. Mitchell agreed to refer Claimant to a pain management center. (*Id.*)

Claimant presented to the pain management center on August 28, 2015, for a consultation. (*Id.* at 1067.) He reported "low back pain that radiates down into the calf of the left leg" that "stems from an old workers compensation case from 15 years ago," as well as shoulder and neck pain. (*Id.* at 1066–67.) An x-ray of Claimant's lumbar spine

showed "L5 spondylolysis without spondylolisthesis or evidence of instability on flexion or extension" and "multilevel degenerative change." (*Id.* at 1074–75; *see id.* at 1069.) Upon physical examination, Claimant was observed to "stand[] and walk[] unassisted," with a "non-antalgic" gait. (*Id.* at 1070.) His lumbar flexion was noted at 45 degrees, and his lumbar extension at 10 degrees. (*Id.*) The evaluator also noted "facet column pain in the lumbar spine, bilaterally." (*Id.*) Claimant's lower extremity movements were observed to be "unrestricted and non-painful," and he had full strength in his muscles. (*Id.*) Straight-leg-raising tests were negative on both sides, but a FABER test was positive on the left side. (*Id.* at 1071.) Claimant was diagnosed with lumbar degenerative disc changes, lumbar spondylosis, lumbar degenerative disc disease/stenosis, and myofascial pain syndrome. (*Id.*) It was recommended that Claimant undergo physical therapy, with the possibility of injections. (*Id.* at 1071–72.) Claimant was also prescribed medication. (*Id.* at 1072.)

Claimant began physical therapy on September 3, 2015, and the initial evaluation revealed "low back mobility deficits, pain and weakness associated with low back pain." (*Id.* at 1077.) The physical therapist noted that Claimant's "rehabilitation potential to achieve functional goals is excellent." (*Id.*) It was recommended that Claimant receive physical therapy three times per week for eight weeks. (*Id.* at 1078.) At his next few appointments, Claimant complained of pain, stiffness, and soreness, and on September 10 and 15, 2015, the physical therapist observed "[d]ecreased sensation to light touch throughout the left lower extremity." (*Id.* at 1079–90.) On September 16, 2015, Claimant reported "an overall improvement of 40% since starting therapy" but expressed that "difficulty still remains with bending and stooping." (*Id.* at 1091.) The physical therapist

observed that Claimant's "[m]otion continues to be limited with pain at the end of the available [range of motion]." (*Id.* at 1092.)

On September 30, 2015, Claimant returned to the pain management center and reported "tolerating [his] medications without side effects" and "satisfactory" pain relief. (*Id.* at 1063.) Claimant also reported that the physical therapy "has helped, but he isn't finished with it yet." (*Id.*) He was scheduled to undergo trigger point injections. (*Id.*)

At his physical therapy appointment on October 2, 2015, Claimant reported "less pain and symptoms in [his] extremities." (*Id.* at 1099, 1102.) The physical therapist noted, "Neurological examination reveals normal sensation, reflexes and muscle power." (*Id.* at 1100, 1103.) However, on October 5, 2015, Claimant reported only 20% overall improvement since starting physical therapy. (*Id.* at 1105.) On October 9, 2015, Claimant stated that he felt "the exercises are . . . helpful for reducing symptoms but . . . report[ed] 'popping and grinding' throughout each one." (*Id.* at 1110.) At his last physical therapy appointment on October 12, 2015, Claimant reported "an overall improvement of 50% since starting therapy" but "difficulty still remains with be[n]ding and picking up objects." (*Id.* at 1113.)

At an appointment on May 24, 2016, Claimant told Dr. Mitchell that he continued to experience "left lower back pain and radicular symptoms down [his left leg]." (*Id.* at 1207.) Dr. Mitchell noted that an MRI "was ordered previously but denied" because Claimant had not undergone physical therapy. (*Id.*) Dr. Mitchell ordered another MRI, which showed "mild arthritic changes in the lumbar spine as well as some spondylolysis without evidence of spondylolisthesis" and an "[a]nnular tear . . . at L4-5 . . . stated as 'possible source of pain.'" (*Id.* at 1200, 1207–08.) Dr. Mitchell explained to Claimant that the MRI "does not show major issues," but Claimant requested a "referral to [a]

neurosurgeon for further evaluation." (*Id.*) Upon physical examination, the motion in Claimant's lumbar spine was observed to be normal, and a neurological examination was unremarkable. (*Id.* at 1202.)

## 2. *Treatment for Right Shoulder Pain*

On October 27, 2009, Claimant presented to the emergency room, explaining that he was injured at work two days prior when lifting a five-gallon water container. (*Id.* at 279.) He stated that he felt "sudden pain in the right shoulder that has persisted" and that he was experiencing numbness and tingling. (*Id.*) His shoulder was "tender[] on palpation," and he had a limited range of motion "due to pain." (*Id.* at 280.) He was diagnosed with a right shoulder strain and given medication. (*Id.*) He was discharged the same day and instructed to follow-up with his primary care provider for an x-ray. (*Id.*) Afterward, Claimant presented to his then-primary care provider, complaining of shoulder pain and numbness in his thumb. (*Id.* at 648.) He was diagnosed with a muscle strain in his shoulder "with nerve involvement" and was instructed to rest and use over-the-counter pain relievers. (*Id.*) He was offered an MRI and physical therapy. (*Id.*)

On October 1, 2014, Claimant presented to Dr. Mitchell, his new primary care provider, complaining of neck pain that "radiates down to [his] right shoulder." (*Id.* at 1129.) Upon physical examination, Dr. Mitchell observed muscle spasms in Claimant's right trapezius muscle and "[d]iscomfort with turning head." (*Id.* at 1131.) He diagnosed Claimant with a trapezius muscle strain and prescribed a muscle relaxer. (*Id.* at 1132–33.)

## 3. *Mental Health Treatment*

On October 14, 2010, Claimant presented to his then-primary care provider, complaining of depression with a history of suicidal ideations. (*Id.* at 649.) He was

prescribed medication and referred for a psychological evaluation. (*Id.*) On February 3, 2011, Claimant told his provider that he did not undergo the evaluation but that the medication "helps some." (*Id.* at 645.)

On February 24, 2016, Claimant presented to Dr. Mitchell, his new primary care provider, seeking refills on his medications, including his depression medication. (*Id.* at 1214.) He did not report experiencing any psychological symptoms, and Dr. Mitchell did not note any abnormal psychological findings. (*Id.* at 1215–16.) Claimant's medication was refilled. (*Id.* at 1217.) At a routine follow-up appointment on May 24, 2016, Claimant reported "no new complaints today" with respect to his depression. (*Id.* at 1209.)

4. *Consultative Examinations and Opinion Evidence*

a. *Dr. W. Roy Stauffer, M.D.*

On June 30, 2010, Dr. W. Roy Stauffer, M.D. ("Dr. Stauffer"), a neurologist, performed a consultative internal medicine examination of Claimant. (*Id.* at 285–90.) Claimant told Dr. Stauffer that he had experienced back pain "for about 12 years" after "strain[ing] his back at work." (*Id.* at 285.) Claimant reported that "[h]is back pain is constant" and "radiates down his left leg to his calf" and "[h]e has occasional numbness." (*Id.*) Claimant further stated that physical therapy and over-the-counter medications did not help the pain, but epidural injections helped, and nerve blocks "helped for a little while." (*Id.*) He reported "difficulty with bending, twisting, lifting, or standing more than five minutes." (*Id.*) Upon physical examination, Dr. Stauffer noted "tenderness over the lumbar spine." (*Id.* at 287.) He observed that Claimant did not use a cane. (*Id.*) A straight-leg-raising test was "90 degrees bilaterally associated with low back pain." (*Id.*) Dr. Stauffer noted full motor strength in Claimant's lower extremities. (*Id.*) He also noted that Claimant could "fully knee squat." (*Id.*)

Claimant also stated that he injured his right ankle at age 15 and as a result "has difficulty with range of motion of his ankle and his right leg is shorter than his left" and "basically has difficulty with walking." (*Id.* at 285.) Upon physical examination, Dr. Stauffer noted that there was "some tenderness of [Claimant's] right ankle to palpation." (*Id.* at 287.) Dr. Stauffer also observed "a decrease in right ankle dorsiflexion to 15 degrees." (*Id.*) Claimant was able to "walk on heels and toes," and his "[g]ait and station are normal." (*Id.*)

In addition, Claimant told Dr. Stauffer that he injured his right shoulder "six months ago . . . at work" and was told "that he had a 'pinched nerve.'" (*Id.* at 286.) Claimant represented that his shoulder "is still sore and he has occasional numbness in his right thumb and right arm." (*Id.*) He stated that "he has difficulty using his right hand and turning his neck" and "also has difficulty gripping and grasping and writing." (*Id.*) Upon physical examination, Dr. Stauffer observed "tenderness over [Claimant's] right lateral epicondyle on his right elbow." (*Id.* at 287.) He further observed a "decrease in right shoulder flexion to 130 degrees and right shoulder adduction to 130 degrees." (*Id.*) Dr. Stauffer noted that Claimant had full grip strength in his hands and full motor strength in his upper extremities and was able to "perform fine manipulation and gross dexterous movements with his hands." (*Id.*)

Dr. Stauffer concluded,

The claimant's main problem from a standpoint of work would probably be his back with some muscle spasm and degenerative disease. He may have a radiculopathy than [sic] his left leg. He has some mild decrease[d] range of motion of his right ankle. I do not find that his right leg is shorter than his left today. He does have some mild problems with his right shoulder

and probably has some sort of inflammatory process going on. He does have significant gout, but it only flares up about twice a year. Therefore, in taking into account the above objective and subjective evidence, I think this claimant could occasionally lift 20 pounds and frequently lift 10 pounds. He can stand and walk six hours in an eight-hour day and sit six hours in an eight-hour day. Push or pull at least occasionally with his upper and lower extremities. From a postural standpoint, he could occasionally climb ladder[s], ropes or scaffolds. He could occasionally balance, stoop, kneel, crouch, and crawl. From a manipulative standpoint, I do not think he would have too much difficulty. I do not think he would have any visual or communicative limitations. From an environmental standpoint, I do not think he would have any limitations.

(*Id.* at 287–88.)

### b. *Dr. Rabah Boukhemis, M.D.*

Dr. Rabah Boukhemis, M.D. ("Dr. Boukhemis"), a state-agency medical consultant, completed a Physical Residual Functional Capacity Assessment form for Claimant on August 4, 2010. (*Id.* at 296–303.) With respect to Claimant's exertional limitations, Dr. Boukhemis opined that Claimant could occasionally lift twenty pounds and frequently lift ten pounds, stand for six hours in an eight-hour workday, sit for six hours in an eight-hour workday, and push and pull without limitation. (*Id.* at 297.) As to his postural limitations, Dr. Boukhemis opined that Claimant could frequently balance and stoop and occasionally climb ramps and stairs, kneel, and crouch but never climb ladders, ropes, or scaffolds or crawl. (*Id.* at 298.) He noted no manipulative, visual, or communicative limitations. (*Id.* at 299–300.) With respect to environmental limitations,

Dr. Boukhemis opined that Claimant could endure unlimited exposure to noise but should avoid concentrated exposure to extreme cold, extreme heat, wetness, humidity, vibration, and fumes, odors, dusts, gases, and poor ventilation, and should avoid even moderate exposure to hazards caused by machinery or heights. (*Id.* at 300.) He reviewed Dr. Stauffer's report and agreed "with Light RFC." (*Id.* at 302.) Dr. Boukhemis summarized, "All [ranges of motion] even though slightly limited are functional for [activities of daily living]. . . . The alleged limitations are out of proportion to the evidence available. Partially credible. RFC reduced." (*Id.* at 303.)

   *c. Dr. Holly Cloonan, Ph.D.*

Dr. Holly Cloonan, Ph.D. ("Dr. Cloonan"), a state-agency psychological consultant, completed a Psychiatric Review Technique form for Claimant on August 20, 2010. (*Id.* at 304–17.) She opined that Claimant did not satisfy Listing 12.04. (*Id.* at 307.) She further opined that Claimant had mild limitations in his activities of daily living, moderate limitations in maintaining social functioning and maintaining concentration, persistence, or pace, and had experienced no episodes of decompensation. (*Id.* at 314.) Dr. Cloonan concluded,

> The claimant seems mostly credible but allegations of [symptom] severity were not fully supported by [the medical evidence of record] in the file. There were also some inconsistencies in his [reports of] his educational & alcohol abuse histories across two [consultative examinations]. A more extensive report of alcohol abuse & [treatment] was provided at the prior [consultative examination]. Although claimant's recent memory was described as severely deficient, review of [his activities of daily living] would

indicate[] no more than mod[erate] limits.  He drives, performs [household] chores, cooks, cares for child & manages money.

(*Id.* at 316.)

Dr. Cloonan also completed a Mental Residual Functional Capacity Assessment form for Claimant on August 20, 2010.  (*Id.* at 318–21.)  She opined that Claimant had no significant limitations in understanding and memory.  (*Id.* at 318.)  With respect to sustained concentration and persistence, Dr. Cloonan opined that Claimant was moderately limited in his abilities "to carry out detailed instructions," "to maintain attention and concentration for extended periods," and "to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (*Id.* at 318–19.)  As to social interaction, Dr. Cloonan opined that Claimant was moderately limited in his "ability to interact appropriately with the general public."  (*Id.* at 319.)  She opined that Claimant had no significant limitations in adaptation.  (*Id.*)  Dr. Cloonan summarized, "The claimant has the above moderate limits in [functional capacity] associated w[ith] his condition.  He is able to learn and perform work-like activities in a low pressure setting w[ith] limited contact w[ith] the public."  (*Id.* at 320.)

### d. Dr. William E. Waltrip, M.D.

Dr. William E. Waltrip, M.D. ("Dr. Waltrip") performed a consultative medical examination of Claimant on May 18, 2011.  (*Id.* at 336–41.)  Claimant told Dr. Waltrip that he had experienced back pain "since approximately 1997" but that it was not associated with "specific injury to his back."  (*Id.* at 336.)  Claimant described the pain as "constant and . . . aggravated by repetitive motion" and stated that it "radiate[d] into his left lower extremity."  (*Id.*)  Claimant stated that he could walk "for approximately 15

minutes" and "stand for 15 minutes" but "has to change positions frequently." (*Id.*) Upon physical examination, Dr. Waltrip noted, "Range of motion testing was done totally without limitation." (*Id.* at 338.) He observed no scoliosis or "evidence of muscle tenderness or spasm." (*Id.*) Dr. Waltrip related that Claimant did "not use a cane or assistive device for ambulation" and "walks with a normal gait." (*Id.*) Claimant was "able to perform the knee squat." (*Id.*)

Claimant also told Dr. Waltrip that he "fractured his right ankle when he was 15 years old" and experienced "pain with weight-bearing now." (*Id.* at 336–37.) Upon physical examination, Dr. Waltrip observed that Claimant "could walk heel-to-toe and tandem" and "could walk on the tips of his toes and his heels." (*Id.* at 338.)

In addition, Claimant reported to Dr. Waltrip that he "hurt his right shoulder approximately one year ago when involved in a motor vehicle accident." (*Id.* at 337.) Upon physical examination, Dr. Waltrip noted that Claimant "could make a fist and had good strength of grip" and "could perform fine manipulations." (*Id.* at 338.)

Dr. Waltrip summarized,

The claimant is a 46-year-old obese male who does have mental health problems that have been evaluated. His back pain, ankle pain and shoulder pain and elbow pain and gout very minimally limit his ability to walk, stand or sit and he should be able to lift moderately heavy objects without limitation. The claimant has no limitation of hearing, seeing or speaking and can understand normal conversational speech. He walks with a normal gait. There is no motor dysfunction, sensory loss or reflex abnormalities. He does not use an assistive device for ambulation. He has good grip

strength and could perform fine and gross manipulations. The range of motion testing was done totally without limitation.

(*Id.* at 338–39.)

### e. Dr. Paul W. Craig II, M.D., CIME

Dr. Paul W. Craig II, M.D., CIME ("Dr. Craig"), an occupational medicine specialist, evaluated Claimant on March 28, 2016. (*Id.* at 1180–83.) Dr. Craig opined that Claimant "is limited primarily to a sedentary activity level with occasional periods of very light, unsustained activity." (*Id.* at 1180.) He further opined, "[Claimant] is clearly unable to work 5 days per week, 8 hour[s] per day. His age, education and medical conditions make successful competition in the job market highly unlikely." (*Id.*)

As to Claimant's functional capacity, Dr. Craig opined that Claimant could lift or carry ten to fifteen pounds but could not do so frequently or even occasionally. (*Id.* at 1181.) He opined that Claimant could stand or walk for two to four hours in a normal workday, but for less than two hours without interruption. (*Id.* at 1182.) He opined that Claimant could sit for four to six hours in an eight-hour workday and two to four hours without interruption. (*Id.*) With respect to postural activities, Dr. Craig opined that Claimant could rarely stoop and crouch but never climb, balance, kneel, or crawl. (*Id.*) Dr. Craig further opined that Claimant's back and right shoulder pain would cause him to have a "[l]imited reach." (*Id.* at 1183.) And he opined that Claimant "is unable to work in any industrial setting due to safety issues" caused by his "[c]hronic pain" and "lack of endurance." (*Id.*)

### C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits. 42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017). The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity." 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i). If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments. *Id.* §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii). The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001). An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step. *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e). The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862. "In determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]." 20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659. Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria. 20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c). "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment." *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d). "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities." *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work. 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180. If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'" *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635). "The Commissioner typically offers this evidence through the testimony of a vocational expert

responding to a hypothetical that incorporates the claimant's limitations." *Id.* (quoting *Mascio*, 780 F.3d at 635). If the claimant can perform other work, the ALJ will find her "not disabled." 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v). If she cannot perform other work, the ALJ will find her "disabled." *Id.*

Applying the sequential evaluation process in this case, the most recent ALJ to consider Claimant's case concluded that Claimant satisfied the insured status requirements through September 30, 2011. (Tr. at 674.) He further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of his disability. (*Id.*) He found that Claimant's degenerative disc disease, right ankle fracture, obesity, "dysfunction of the joints in the right ankle and shoulder," depression, and chronic kidney disease constituted "severe" impairments. (*Id.* at 674–75.) However, he found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 675–77.) Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform light work . . . except he can occasionally push or pull with the bilateral upper and lower extremities," "can occasionally climb ramps and stairs" but "never climb ladders, ropes, or scaffolds," and "can occasionally balance, stoop, kneel, crouch, and crawl." (*Id.* at 677.) In addition, the ALJ found that Claimant "will require a sit or stand option on a 30-minute basis" and "can perform work like activities in a low-pressure setting and have occasional contact with supervisors, coworkers, and the public." (*Id.*)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, he was "capable of performing past relevant work as security [sic] guard in the coal mines" as he actually performed it. (*Id.* at 683–84.) The ALJ further found Claimant is capable of working as a routing clerk, price marker, sorter, or inspector. (*Id.* at 684–85.) As a

result, the ALJ concluded that Claimant was not "under a disability . . . from April 10, 2010, through the date of this decision." (*Id.* at 685.)

## II.   LEGAL STANDARD

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)).   "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id.* (alteration omitted).   "[T]he threshold for such evidentiary sufficiency is not high." *Id.* "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)).   Even if "reasonable minds [could] differ as to whether a claimant is disabled," this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

## III.   ANALYSIS

Claimant argues that the ALJ[4] erred by discounting his subjective complaints about his back pain and mental limitations.  (ECF No. 20 at 3–8.)  He further asserts that

---

[4] To the extent Claimant attempts to challenge the decision of the first ALJ to consider his claims after remand to the Commissioner by this Court, that decision is not a "final decision" reviewable under 42 U.S.C. § 405(g).  *Smith v. Berryhill*, 139 S. Ct. 1765, 1773 (2019) (explaining that § 405(g) permits judicial review

he "grids out" pursuant to Medical–Vocational Guidelines Rule 201.14.  (*Id.* at 8–9.)

Claimant asks this Court to award him benefits or to remand this matter to the ALJ.  (*Id.*

at 9.)  The Commissioner responds that the ALJ properly evaluated Claimant's subjective

complaints in light of the objective findings in the record—which revealed no functional

limitations—the medical opinion evidence, and Claimant's own statements about his

activities of daily living.  (ECF No. 23 at 10–14.)

  *A. Claimant's Subjective Complaints*

  Claimant's principal argument is that the ALJ failed to properly evaluate his

subjective complaints.  (ECF No. 20 at 3–8.)  As part of the RFC assessment, the ALJ must

evaluate a claimant's "statements and symptoms regarding the limitations caused by her

impairments."  *Linares v. Colvin*, No. 5:14-cv-00120, 2015 WL 4389533, at *5 (W.D.N.C.

July 17, 2015) (citing 20 C.F.R. §§ 404.1529, 416.929; *Craig v. Chater*, 76 F.3d 585, 593–

96 (4th Cir. 1996)).  To evaluate the disabling effect of an individual's symptoms, the ALJ

first determines whether "objective medical evidence" supports the existence of "a

condition reasonably likely to cause the [symptoms] claimed."  *Hines v. Barnhart*, 453

F.3d 559, 565 (4th Cir. 2006); *see* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  If so, the

ALJ then "evaluate[s] the intensity and persistence of [the claimant's] symptoms" to

"determine how [those] symptoms limit [the claimant's] capacity for work."  20 C.F.R.

§§ 404.1529(c)(1), 416.929(c)(1).  An individual's subjective complaints about his

symptoms are relevant to the latter determination.  *See id.* §§ 404.1529(c)(3),

_____

of "final decision"); *Bryant v. Colvin*, No. 1:13-cv-00012-MOC, 2013 WL 5540296, at *3 (W.D.N.C. Oct. 8, 2013) ("By [Appeals Council] granting [claimant's] request for review and remanding the claim to the ALJ, the first decision of the ALJ could never have become a final determination of the Commissioner.").  As such, the undersigned considers only the January 8, 2018 decision of the second ALJ to consider Claimant's case after remand to the Commissioner by this Court.  (*See* Tr at 665 ("The [ALJ's] decision [dated January 8, 2018,] is the final decision of the Commissioner of Social Security after remand by the court.").)

416.929(c)(3).  Put simply, the claimant's symptoms "must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the [symptoms], in the amount and degree, alleged by the claimant." *Johnson v. Barnhart*, 434 F.3d 650, 657 (4th Cir. 2005) (per curiam) (quoting *Craig*, 76 F.3d at 591).  The ALJ is obligated to "assess whether the claimant's subjective symptom statements are consistent with the record as a whole." *Vass v. Berryhill*, No. 7:17-cv-87, 2018 WL 4737236, at *6 n.4 (W.D. Va. June 12, 2018), *adopted by* 2018 WL 4704058 (W.D. Va. Sept. 30, 2018).

Here, the ALJ found that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [his] statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (Tr. at 681.)  In reaching that conclusion, the ALJ first summarized Claimant's hearing testimony, in particular noting Claimant's testimony about his back pain, which he said radiated into his legs and caused him to have difficulty standing and sitting.  (*Id.* at 678.)  The ALJ also noted that Claimant testified his daily activities included performing "chores around the house," mowing the lawn, going grocery shopping, watching television, and reading the news on the computer.  (*Id.*)  The ALJ next reviewed Claimant's treatment for depression, observing that Claimant "had normal mental health examinations" and that his depression was treated with medication and not with therapy.  (*Id.*)

Moving on to the evidence related to Claimant's degenerative disc disease, right ankle fracture, and dysfunction of the right ankle and shoulder joints, the ALJ reviewed

the results of March 16, 2010 and April 5, 2012 MRIs of Claimant's lumbar spine,[5] which revealed degenerative changes and foraminal impingement, and two physical examinations conducted in July 2010 and May 2011. (*Id.* at 679.) The ALJ noted that the July 2010 examination by Dr. Stauffer revealed tenderness in Claimant's lumbar spine and a "straight leg raise . . . to 90 degrees bilaterally associated with low back pain," but Claimant was observed to walk normally and did not use a cane, and he had full strength in his lower extremities. (*Id.*) The ALJ further noted that Dr. Stauffer observed tenderness in Claimant's right ankle and right elbow and that Claimant had some decreased range of motion in his right ankle and right shoulder. (*Id.*) With respect to the May 2011 examination by Dr. Waltrip, the ALJ noted that Claimant had full range of motion in his back, could walk without the use of an assistive device, and could "knee squat." (*Id.*) The ALJ also described Claimant's treatment with Dr. Mitchell, noting that although Claimant continually complained of back pain and requested a referral to a pain management clinic, his physical examinations were normal. (*Id.* at 679–80.) He reviewed Claimant's treatment at the pain management center between August and October 2015, noting that upon examination, Claimant was able to stand and walk unassisted with a non-antalgic gait, had normal muscle strength "on a global basis," and his "lower extremity movements were unrestricted and non-painful." (*Id.* at 680.) The ALJ noted that Claimant was treated with trigger point injections. (*Id.*) The ALJ also

---

[5] Claimant's contention that the ALJ failed to consider the March 16, 2010 and April 5, 2012 MRI reports, as directed by this Court in its September 30, 2014 order, is plainly without merit. (ECF No. 20 at 3, 8.) This Court remanded this matter to the ALJ because the MRI reports "involve[] a competing opinion and relate[] to the credibility of Claimant's pain that may require reconciliation by a fact-finder." (ECF No. 13 at 11.) In other words, the ALJ was instructed to evaluate the MRI reports against the other evidence in the record. The ALJ did so: his discussion of the evidence related to Claimant's degenerative disc disease mentions both MRI reports, in addition to other physical findings spanning the seven-year period between March 2010 and March 2017. (Tr. at 679–80.) This Court's order neither demanded nor implied a specific conclusion as to how the MRI reports affected Claimant's credibility. (*See* ECF No. 13.)

summarized the physical therapy Claimant received in September and October 2015, noting that "examination . . . identified low back mobility deficits, pain, and weakness associated with low back pain," but Claimant's "rehabilitation potential to achieve his functional goals was rated as excellent." (*Id.*)

Ultimately, the ALJ's review of this evidence led him to conclude that Claimant's subjective complaints about his pain and other symptoms were not consistent with the record. (*Id.* at 681.) The ALJ explained that although Claimant "alleged he could not work," he was able to care for himself "unassisted," prepare "simple meals daily," do household chores, "shop in stores for groceries and clothes," and handle his finances. (*Id.*) The ALJ further explained that although Claimant "alleges severe back pain . . . most of his physical examinations within the record have had substantially normal findings other than the degenerative changes. . . . The fact that [Claimant] alleges such severe restrictions physically due to his pain, but this has not shown up consistently on objective examination undermines the consistency of his statements and claim." (*Id.*)

Claimant essentially asks this Court to reevaluate the evidence in the record and reject the ALJ's findings related to Claimant's subjective complaints, which this Court is not permitted to do. *Craig*, 76 F.3d at 589 ("In reviewing for substantial evidence, we do not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the Secretary." (citing *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990))). If, as here, the ALJ's evaluation of a claimant's subjective complaints is adequately explained, the ALJ's findings "will be reversed only if the claimant can show that [the findings were] patently wrong." *Thomaselli v. Berryhill*, No. 1:18-cv-105, 2019 WL 4542855, at *9 (N.D.W. Va. Sept. 19, 2019) (alterations and internal quotation marks omitted). The ALJ expressly mentioned in his analysis each piece of

evidence that Claimant identifies in his brief, with the exception of a June 27, 2012 CT scan that, like several other pieces of evidence in the record, reflected degenerative disc disease in Claimant's lumbar spine. (*Compare* Tr. at 677–83*, with* ECF No. 20 at 4–6; *see* Tr. at 1118–19.) Claimant may disagree with the ALJ's assessment of this evidence, but "[t]he mere fact that the ALJ did not find [Claimant] to be fully credible does not suggest that [his] determination was in error." *Shore v. Astrue*, No. 1:10-cv-238, 2013 WL 438122, at *7 (M.D.N.C. Feb. 5, 2013), *adopted by* 2013 WL 1320504 (M.D.N.C. Mar. 29, 2013). The ALJ's evaluation of Claimant's subjective complaints is supported by substantial evidence.

### B. Application of GRID Rule 201.14

Claimant also argues that the ALJ should have deemed him disabled pursuant to GRID Rule 201.14. (ECF No. 20 at 8–9.) "The Medical–Vocational Guideline (GRID) Rules . . . reflect the major functional and vocational patterns encountered in cases that cannot be evaluated on medical considerations alone, where an individual with a severe medically determinable physical or mental impairment is not engaging in substantial gainful activity and the individual's impairment prevents the performance of his vocationally relevant past work." *Loudermilk v. Astrue*, No. 1:07-cv-141, 2009 WL 2584733, at *7 (N.D.W. Va. Aug. 18, 2009). The GRID rules may be used at step five of the sequential evaluation process to aid the Commissioner in meeting his burden to "prov[e] that significant numbers of jobs exist in the national economy" that the claimant may perform. *Bisceglia v. Colvin*, No. 3:15-cv-83 (JRS), 2016 WL 8715582, at *4 (E.D. Va. Feb. 19, 2016) (citing *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987)), *adopted by* 173 F. Supp. 3d 326 (E.D. Va. 2016). "Where the findings of fact made [by the ALJ] with respect to a particular individual's vocational factors and [RFC] coincide with all of

the criteria of a particular rule, the rule directs a conclusion as to whether the individual is or is not disabled." 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a). But if "any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled." *Id.*

GRID Rule 201.14, which Claimant contends applies here (ECF No. 20 at 8), provides that an individual who is limited to sedentary work, is closely approaching advanced age, is at least a high school graduate, and has skilled or semi-skilled previous work experience but no transferable skills is deemed disabled. *Id.* § 201.00 tbl.1. Here, however, the ALJ found that Claimant had the RFC to perform a limited range of *light* work. (Tr. at 677.) As support for his assertion that he is instead limited to sedentary work, Claimant points to consultative examiner Dr. Craig's opinion that Claimant "is limited primarily to a sedentary activity level with occasional periods of very light, unsustained activity" and argues that the ALJ erred by assigning "little weight" to that opinion. (ECF No. 20 at 8.) But the ALJ explained that Dr. Craig's opinion "is too restrictive to be consistent with the totality of the medical record" and cited to contemporaneous objective medical findings by Dr. Mitchell, Claimant's primary care provider, that showed Claimant's "gait and stance were normal" and "[n]eurologically he was normal." (Tr. at 683.) Generally, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001) (quoting *Craig*, 76 F.3d at 590). For the reasons he explained, the ALJ was not required to adopt Dr. Craig's opinion.

Regardless, the ALJ's RFC findings are supported by substantial evidence. The ALJ relied on the opinions of consultative examiner Dr. Stauffer, state-agency medical consultant Dr. Boukhemis, and state-agency psychological consultant Dr. Cloonan in crafting Claimant's RFC. (*See* Tr. at 681–82.) He gave "great weight" to Dr. Stauffer's opinions about Claimant's abilities because they were "consistent of [sic] the overall medical record and Dr. Stauffer's examination." (*Id.* at 681.) He also assigned "great weight" to Dr. Boukhemis's opinions about Claimant's abilities because they were "based on a thorough review of the available medical records and a comprehensive understanding of agency rules and regulations" and were "consistent with the medical evidence." (*Id.* at 682.) And he gave "great weight" to Dr. Cloonan's opinions because they were "support[ed]" by "objective medical evidence." (*Id.*) It is proper for such opinions to provide a basis for the RFC assessment. *See Pine v. Berryhill*, No. TJS-17-1897, 2018 WL 3973078, at *2 (D. Md. July 2, 2018); *see also Young-Schonyers v. Colvin*, No. 0:13-cv-02951-JMC, 2015 WL 1522367, at *7 (D.S.C. Mar. 31, 2015) ("The ALJ adequately explained his RFC findings and cited to the evidence of record forming the basis for his determination . . . .").

Because the ALJ properly concluded that Claimant was limited to light work, not sedentary work, GRID Rule 201.14 does not apply in this case. 20 C.F.R. § 416.969 ("[W]e do not apply these rules if one of the findings of fact about the person's vocational factors and [RFC] is not the same as the corresponding criterion of a rule."). Moreover, the GRID rules "are not to be treated as conclusive" when, as here, the claimant "has nonexertional limitations in addition to exertional limitations." *Gordon v. Berryhill*, No. 2:17-cv-02280-MGL-MGB, 2019 WL 653966, at *10 (D.S.C. Jan. 28, 2019) (citing 20 C.F.R. § 404.1569; *Roberts v. Schweiker*, 667 F.2d 1143, 1145 (4th Cir. 1981); *Pratts v. Chater*,

94 F.3d 34, 39 (2d Cir. 1996)), *adopted by* 2019 WL 652073 (D.S.C. Feb. 14, 2019).  The ALJ's RFC findings in this case include several nonexertional limitations.  (Tr. at 677.) *See Gordon*, 2019 WL 653966, at *11 ("The proper inquiry . . . is whether a given nonexertional condition affects an individual's [RFC] to perform work of which he or she is exertionally capable." (citing *Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984))).  Therefore, "the Commissioner, in order to prevail, must be required to prove by VE testimony that, despite the claimant's combination of nonexertional and exertional impairments, specific jobs exist in the national economy which he or she can perform." *Id*. (citing *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983)).  The Commissioner should also rely on VE testimony at step five where, as here, the ALJ finds that an individual has the RFC to perform less than the full range of light work.  *See Gibson v. Astrue*, No. 3:10-cv-226, 2010 WL 4789659, at *4–*5 (E.D. Va. Oct. 27, 2010), *adopted by* 2010 WL 4788211 (E.D. Va. Nov. 16, 2010).  The ALJ did so here, concluding not only that Claimant could perform his past relevant work as it was actually performed but also that other work at the light and sedentary levels of exertion was available.  (Tr. at 683–85.)  This was not error.

## IV.    CONCLUSION

For the foregoing reasons, Claimant's request to reverse the Commissioner's decision (ECF No. 20) is **DENIED**, the Commissioner's request to affirm his decision (ECF No. 23) is **GRANTED**, the final decision of the Commissioner is **AFFIRMED**, and this action is **DISMISSED**.

**IT IS SO ORDERED.**

The Clerk is **DIRECTED** to file this Memorandum Opinion and Order and to transmit a copy of the same to counsel of record.

ENTER: March 2, 2020

Dwane L. Tinsley
United States Magistrate Judge